UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KLAUS WILKE; RITA E. WILKE,
Plaintiffs-Appellees,

v.

No. 94-2062

WILDER CORPORATION, formerly
known as Wilder Mobile Homes,
Incorporated,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(CA-93-238-3-17)

Argued: October 30, 1995

Decided: January 8, 1996

Before NIEMEYER and MICHAEL, Circuit Judges,
and PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John F. Emerson, SINKLER & BOYD, P.A., Columbia,
South Carolina, for Appellant. Edward Mobley Woodward, Jr.,
WOODWARD, LEVENTIS, UNGER, DAVES, HERNDON &
COTHRAN, Columbia, South Carolina, for Appellees. **ON BRIEF:**
Palmer Freeman, Jr., SINKLER & BOYD, P.A., Columbia, South

Carolina, for Appellant. Darra W. Cothran, WOODWARD, LEVEN-TIS, UNGER, DAVES, HERNDON & COTHRAN, Columbia, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In this diversity action Wilder Corporation (Wilder) appeals from a judgment of the district court awarding damages for breach of obligations imposed in a Bond for Title. The principal assignment of error is to a finding of fact which it is claimed was clearly erroneous and infected the court's ultimate finding of liability. We conclude that the challenged finding was not clearly erroneous and that no clearly erroneous finding affecting the judgment can be implied from it. Accordingly, we affirm.

I

In 1980, Wilder sold a South Carolina mobile home park, McGregor Downs, to Klaus and Rita Wilke. This sale was memorialized in a Bond for Title, which provided that Wilder would retain possession of the deed until the Wilkes had finished paying off the purchase price. The Wilkes were entitled to and took immediate possession of the property and were obligated to meet a schedule of payments that ran through early 1995. Most importantly, the Bond included a special provision that required Wilder to maintain responsibility for the park's on-site sewer system even after the Wilkes took possession of the property in 1980. The exact extent of that responsibility is the issue in the case.

The park's sewer system had been deemed inadequate by the state's Department of Health and Environmental Control well before

2

the sale. The Wilkes had, therefore, secured the following provision in the Bond:

> The parties further acknowledge that presently the South Carolina Department of Health and Environmental Control is concerned with the adequacy of the sewage treatment facility located on the subject property. The parties agree to coordinate in resolving the difficulty. The obligor[Wilder] agrees to contract with the Town of Springdale to join its system as soon as practicable and to pay the cost, if any, of upgrading said facility to meet the municipal and governmental requirements until the Springdale facility tap-on is completed; provided, however, the obligor retains the right to negotiate with the agencies involved in reaching an agreement on the measures required for upgrading the facility, whether they be temporary or of a more permanent nature. . . . Should the Springdale facility not be provided or tap-on not completed, the obligors shall bear the costs of complying with the South Carolina Department of Health and Environmental Control requirements as to the existing sewage treatment facility located on subject property, and any penalties charged shall be paid by obligor. In the event of non-payment by obligor, the obligees [the Wilkes] may, at their option, elect to pay said penalty and deduct said amount paid as an offset against the monthly installments hereunder.

J.A. 209-10.

Wilder's attempt to connect the mobile home park to Springdale's sewer system as contemplated by the Bond proved a failure by the spring of 1983. So, in the fall of 1983, Wilder finally brought the on-site sewer system into compliance with state requirements and received a permit to operate the facility, a permit that remained permanently in Wilder's name. At that point, it sought to have the Wilkes agree that its obligations and potential liability were at an end. The Wilkes, however, refused to sign a letter to that effect that Wilder had sent them for signature. Four years later, they sought to sell the park to a third party, at which time Wilder, as holder of the Bond for Title, insisted again that it not only needed financial information about the

3

new purchaser but assurances from the Wilkes and the purchaser alike that Wilder bore no continuing responsibility for the sewer system. These assurances were not forthcoming, and the sale was never completed.

During the subsequent years, problems with the system continued. The Wilkes apparently paid some small fines that the state imposed for violations of state regulations. When they were hit with a fine of $5,000 in 1989, however, they decided it was too big for them to handle and that Wilder should pay it. Failing to get Wilder to pay that fine, they eventually withheld it from their monthly payments on the Bond. They also brought a declaratory judgment action, seeking a ruling that Wilder was still obliged to absorb the ongoing costs associated with the sewer system. Without conceding that point, Wilder eventually settled the case and agreed to absorb the $5,000 rather than litigate so small a dispute. J.A. 52-53.

In 1990, the state finally insisted that the Wilkes hook on to a larger sewer system, Midlands Utility, and obtained a consent decree to that effect. The Wilkes completed the hook-up in 1991 at a cost of about $124,000. The Wilkes asserted that the Bond obligated Wilder to pay that cost, and so they sought to have Wilder reimburse them. Wilder took the position that its obligation had expired no later than the fall of 1983 and refused to pay for the 1991 hook-up. The Wilkes then brought this diversity action in which they sought a declaratory judgment that Wilder's obligation extended to the $124,000.

Following a bench trial, the district court found that the parties had intended to impose on Wilder a general, ongoing responsibility for resolving the problems with the sewer; that they had failed to place any time limit on that responsibility; and that the Wilkes' contract with Midlands occurred within a reasonable time after the imposition of that ongoing responsibility. On that basis, the court concluded that the cost of the hook-up remained Wilder's responsibility and not the Wilkes' within the meaning of the Bond provision. Judgment against Wilder in that amount was entered accordingly.

This appeal followed.

4

II

Wilder's specific challenge is to the last sentence of the district court's Finding of Fact 23: that Wilder had not asserted a claim against the Wilkes in response to their withholding of the $5,000 owed Wilder to apply against the fine imposed against them in 1989. Wilder's essential defense to the action was that the parties had intended that Wilder be released once the sewer was brought into compliance, which he claims occurred in 1983. Its argument is that the district court's ultimate finding that the obligation extended past that point was necessarily predicated materially on its finding that as late as 1989, Wilder was effectively conceding continuing obligation by not attempting to recoup the $5,000 payment withheld by the Wilkes. And, Wilder contends, the finding was clearly erroneous because the evidence clearly shows that the failure to assert a claim involved no such concession on its part.

Reviewing this finding for clear error, we ask whether our consideration leaves us with a definite and firm conviction that a mistake has been made. Wileman v. Frank, 979 F.2d 30, 34 (4th Cir. 1992). On that point, we are by no means satisfied, certainly not definitely and firmly convinced, that looked at in isolation the specific finding that "Wilder never assert[ed] a claim against Wilke for the $5,000" is erroneous. Indeed it seems literally correct. As Wilder's counsel conceded in oral argument, Wilder indeed never asserted such a claim. What Wilder really is challenging is not the accuracy of that specific finding but an implication from it which it thinks must have been drawn by the district court: that Wilder never objected in any way to the withholding of the $5,000. Such a further finding, whether made expressly or by necessary implication, would have been clearly erroneous for, as Wilder points out without contradiction, it forewent the $5,000 simply as an aspect of a settlement in which nothing was conceded. And such a finding might have raised legitimate questions of prejudice to the judgment. But such a more expansive and possibly prejudicial finding was not expressly made and we are satisfied that it is not necessarily implicit in the district court's ultimate finding of continuing obligation.

To conclude that such a finding was necessarily implicit in the ultimate finding of obligation would require us to discount the substantial

5

indication that the judge accurately understood the true implications of Wilder's conduct vis-a-vis the $5,000. The record plainly reveals that understanding. In colloquy respecting the settlement negotiations that followed the Wilkes' withholding of the $5,000 owed Wilder, the following exchange occurred:

> THE COURT: . . . That settlement was totally without prejudice to both sides' right to litigate this issue?
>
> . . . .
>
> MR. WOODWARD: That's right. . . . Because there was $5000 at risk, nobody wanted to litigate something of this magnitude over $5000.

J.A. 53. Given that necessary understanding of the situation, we could not ascribe to the court any implied finding that Wilder's conduct involved a concession of continued liability at that point.

Even more critically, the district court's express reasoning on the way to its ultimate finding of continuing obligation belies any conclusion that it rested at all on Wilder's conduct vis-a-vis the $5,000. The court correctly drew on South Carolina law for the propositions that interpretation of a contract requires the factfinder to determine the true intentions of the parties in light of all the circumstances, Langston v. Niles, 219 S.E.2d 829, 833 (S.C. 1975), and that the absence from a contract of a date for performance means that the obligations under the contract extend only for a "reasonable time," Drews Co. v. Ledwith-Wolfe Assocs., 371 S.E.2d 532, 533 (S.C. 1988). Then, in determining under this case law whether Wilder's obligations under the contract extended to payment for the hook-up to Midlands in 1991, the court relied explicitly and reasonably on a number of pieces of evidence without mentioning, let alone relying on, the parties' conduct respecting the $5,000 fine.

In determining the parties' intent, the court first noted Klaus Wilke's testimony that he had had no experience in running a sewer system and had had no interest in getting into the wastewater treatment business. On this basis, the court found that the parties had

6

intended that Wilder, which was experienced in managing sewer systems for mobile home parks, should "take complete responsibility for remedying the sewer problems." J.A. 280. In particular, the "basic intent . . . was that Wilder would pay to hook McGregor Downs onto a municipal or commercial sewer facility" and that the specification of Springdale's facility was not a material term of the contract. J.A. 280. In the meantime, Wilder was obligated to bear the costs of keeping the sewer system in the condition required by the state, but that obligation did not replace its obligation eventually to pay for a hookup to a municipal system. Finally, the court found that the costs incurred in 1991 did arise within a reasonable time of the signing of the contract in 1980, especially because the sewer system had experienced continuing problems through much of those eleven years while Wilder ignored Wilke's requests for help in resolving those problems. J.A. 281.

The court also offered a variation on this interpretation of the contract, which rested on the clause that required Wilder, in any event, "to bear the cost of complying" with the state's requirements "as to the existing sewage facility." In light of testimony by a state environmental official that the park's facility had been identified by 1979 as needing to be hooked up to a municipal or commercial sewer system, the court found that the "broad language of the Contract quoted above encompasses DHEC's requirement that McGregor Downs be connected to Midlands Utility." That is, according to the court, the parties knew at the time of contracting that the park would very likely be required to hook up to a larger system, and they agreed that Wilder would pay the costs of whatever the state required to be done about the defective facility, including the cost of hooking up to a system such as Midlands once the state so required. J.A. 282-83.

Finally, almost incidentally, the court found that Wilder believed as late as 1987 that "it still had potential liability for the McGregor Downs sewer system under the Bond for Title," citing a 1987 letter from Wilder's Assistant Corporate Secretary. That letter had first requested assurances from Klaus Wilke and a potential buyer of the park that Wilder had "no further liability" regarding the sewer system and then went on to say that, "At that point , the only obligation of Wilder Corporation would be to continue to have the sewer plant

7

operating permit in the name of Wilder Corporation .. . ." District Court Opinion at J.A. 284 (emphasis added by district court).

We conclude that the district court's ultimate finding of continuing obligation on which its judgment was based was not infected with any clearly erroneous finding of fact, express or implied, and was amply supported by the evidence.

AFFIRMED

8